UNITED STATES, Appellee

v

RICHARD E. CRAWFORD, Private E-2,
U. S. Army, Appellant

15 USCMA 31, 35 CMR 3

32

No. 17,453

September 18, 1964

*Captain Charles W. Schiesser* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Captain Daniel H. Benson.*

*Captain John C. Cortesio, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis M. Cooper* and *Captain William L. Leonard.*

## Opinion of the Court

QUINN, Chief Judge:

The question on this appeal,[1] and in several similar cases, is whether the method by which enlisted court members were selected discriminated against the lower enlisted ranks in such way as to threaten the integrity of the courts-martial system and violate the Uniform Code of Military Justice.

Ordinarily, an objection to the method of selection of the triers of the facts must be made before trial. *Shotwell Mfg. Co. v United States,* 371 US 341, 9 L ed 2d 357, 83 S Ct 448 (1963); *United States v Gale,* 109 US 65, 27

L ed 857, 3 S Ct 1 (1883); *United States v Klock,* 210 F2d 217 (CA 2d Cir) (1954). Objection was not made in this case until the record of trial was before the board of review. Consequently, Government counsel contend the accused waived the right to challenge the validity of the selection process, since it does not appear he was unaware of the essential facts until he presented the matter to the board of review. See *United States v Beer,* 6 USCMA 180, 19 CMR 306. However, in two cases pending before us, the issue was raised at trial; and it appears likely to arise frequently until

---

[1] The accused was convicted of three specifications of assault with a dangerous weapon, and sentenced to a bad-conduct discharge, total forfeitures, confinement at hard labor for three years, and reduction to Private E-1. Modification of the sentence by the convening authority reduced the confinement to one year.

decided on the merits. Appropriately, therefore, we can pass over the procedural deficiency to reach the substance of the issue, which was considered by the board of review. See Coleman v Alabama, 377 US 129, 12 L ed 2d 190, 84 S Ct 1152 (1964); United States v Culp, 14 USCMA 199, 203, 33 CMR 411; United States v Hood, 9 USCMA 558, 26 CMR 338.

Beyond waiver, the first issue for consideration is the standard of selection of courts-martial members.[2] Appellate defense counsel maintain military due process requires that the methods of selection approximate those in the civilian courts to insure a panel drawn from a cross section of the entire military community. Oppositely, the Government contends civilian standards are "antagonistic" to the military requirements. In support, it quotes a statement from the Court of Appeals for the Tenth Circuit to the effect that "decisions respecting the right to trial by one's peers in civil courts are inapplicable" to the military courts. DeWar v Hunter, 170 F2d 993, 997 (1948), cert den 337 US 908, 93 L ed 1720, 69 S Ct 1048 (1949).

Under the Fifth and Sixth Amendments to the United States Constitution, persons in the armed forces do not have the right to indictment by grand jury and trial by petit jury for a capital or infamous crime. Ex parte Quirin, 317 US 1, 87 L ed 3, 63 S Ct 2 (1942). However, courts-martial are criminal prosecutions, and those constitutional protections and rights which the history and text of the Constitution do not plainly deny to military accused are preserved to them in the service. United States v Culp, supra. Constitutional due process includes the right to be treated equally with all other accused in the selection of impartial triers of the facts. Methods of selection which are designed to produce a court membership which has, or necessarily results in, the appearance of a "packed" court are subject to

[2] We express our appreciation to both Government counsel and appellate defense counsel for their helpful briefs.

34

challenge. United States v Hedges, 11 USCMA 642, 29 CMR 458; see also United States v Sears, 6 USCMA 661, 20 CMR 377. We should, therefore, consider the challenge to the integrity of the selection process, in the light of the experience and learning of the civilian courts that have dealt with challenges of the various methods of choosing juries. See United States v Baker, 14 USCMA 311, 34 CMR 91.

The legislative branch of the Government has broad power to prescribe the qualifications of jurors. United States v Wilson, 158 F Supp 442 (MD Ala) (1958), affirmed 255 F2d 686 (CA 5th Cir) (1958), cert den 358 US 865, 3 L ed 2d 98, 79 S Ct 97 (1958); United States v Mirabal Carrion, 140 F Supp 226 (Puerto Rico) (1956). Consistent with the public interest, it may exclude various groups in the community from eligibility. Rawlins v Georgia, 201 US 638, 50 L ed 899, 26 S Ct 560 (1906). From the time of the War of Independence until 1948, membership on courts-martial was limited to officers. The accused does not dispute, and we do not doubt, the constitutionality of the practice, antedating, as it does, the adoption of the Constitution, which specifically exempts the military from the jury trial provision. See United States v Culp, supra. After World War I, there was a considerable agitation, perhaps most articulately advanced by General Samuel T. Ansell, a judge advocate of the Army, to make enlisted persons eligible for appointment to a court-martial convened to try an enlisted accused. The attempt did not succeed at that time, but it gave strength and direction to the World War II reform movement. Morgan, "The Background of the Uniform Code of Military Justice," 6 Vanderbilt Law Review 169 (1953). In 1948, the Elston Act modified the Articles of War, which governed the Army and the Air Force, to provide for enlisted membership on a court-martial, if requested by an enlisted accused. Elston Act, Public Law 759, 80th Congress, 62 Stat 604, 628, approved June 24, 1948. In 1950, Congress enacted the Uniform Code of Military Justice for all the armed forces. With some modification of the

Elston Act, the Code carried over the right of an enlisted accused to be tried by a court-martial composed in part of enlisted persons. The pertinent provision reads as follows:

"Any enlisted member of an armed force on active duty who is not a member of the same unit as the accused is eligible to serve on general and special courts-martial for the trial of any enlisted member of an armed force who may lawfully be brought before such courts for trial, but he shall serve as a member of a court only if, before the convening of the court, the accused personally has requested in writing that enlisted members serve on it. After such a request, the accused may not be tried by a general or special court-martial the membership of which does not include enlisted members in a number comprising at least one third of the total membership of the court, unless eligible enlisted members cannot be obtained on account of physical conditions or military exigencies. If such members cannot be obtained, the court may be convened and the trial held without them, but the convening authority shall make a detailed written statement, to be appended to the record, stating why they could not be obtained." [Article 25(c)(1), 10 USC § 825.]

It is unnecessary for present purposes to review the reasons for, and the long evolution of, the qualification of enlisted persons for service on courts-martial. Suffice it to say that the right to enlisted court members was deemed important. Its importance is emphasized by the exceedingly narrow and specifically defined conditions under which a trial can be had without enlisted membership. As Mr. Felix Larkin, one of the principal draftsmen of the Code, informed the Subcommittee of the House Armed Services Committee, which held hearings on the Uniform Code, the denial of the right to enlisted members would be justifiable only "in the most exceptional type of case," where the conditions "made it impossible for . . . [the convening authority] to obtain enlisted men."

Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 1150, 1151.

Here, the accused asked for, and was granted, enlisted court members. Of the four persons appointed to the court, three were sergeants major (E–9), and one was a master sergeant (E–7). The accused contends the method by which these members were selected violated the Uniform Code in that, all enlisted persons in grades lower than E–7, and all specialists regardless of grade, all of whom were otherwise eligible for appointment, were arbitrarily and discriminatorily excluded from consideration. He also contends the selection process was invalid because a Negro enlisted man was arbitrarily included in the court membership. The Government does not question the facts upon which the accused's allegation of error is predicated, but it denies the validity of the accused's conclusions. The facts are set out in affidavits by persons who participated in the selection process.

From the affidavits, it appears that in the late afternoon of the day before trial, the accused, through his counsel, informed trial counsel he desired to exercise his right to have enlisted members on the court. The request was transmitted to the staff judge advocate, who told his deputy to obtain from the adjutant general's office a list of "senior noncommissioned officers who were regarded as responsible and available for court-martial duty." The staff judge advocate requested senior noncommissioned officers because he regarded "seniority of rank . . . [as an] indication of civic responsibility and intelligence." He also asked, because the accused is Negro and the alleged assaults were against white soldiers, that the list include at least one member of that race. The deputy telephoned the instructions to the deputy adjutant general, who in turn passed them on to the noncommissioned officer in charge, Sergeant Major R. M. Nelson. Understanding he was to select "mature, responsible, and experienced senior noncommissioned officers," Sergeant Nelson compiled a list of eight or ten names by "random" selection from the

**35**

"personnel rosters" in the office. The names were submitted by telephone to the staff judge advocate's office. A written list with the names of Negro nominees marked with asterisks was prepared, and given to the chief of staff. He took the list to the convening authority. Three or four of the eight or ten names on the list were selected by the convening authority. No Negro on the list was chosen. Instead, the general asked by name for a Sergeant Jones who was believed to be a Negro. Jones, however, was not a member of that race. The adjutant general suggested two other enlisted men believed to be Negro; one turned out to be white; the other was rejected because two members of his command were already "tapped" for the court. After further inquiry, the staff judge advocate succeeded in obtaining a "responsible" Negro sergeant first class from an engineer unit. He was accepted by the convening authority, and on the day of trial was added to the court. According to the staff judge advocate, his sole purpose was to obtain "court members with integrity and common sense." He regarded his method of selection as better designed to achieve that purpose than the mere submission of a list of names obtained "willy-nilly out of the . . . duty rosters of the Adjutant General." And he believed the method was sanctioned by the practice in the Federal courts as delineated in United States v Hoffa, 205 F Supp 710 (SD Fla) (1962).

Undeniably, the selection of mature, responsible, and available persons for court-martial membership is in the best tradition of the judicial process. All civilian jurisdictions have similar qualifications for jurors. See 28 USC § 1861; United States v Dennis, 183 F2d 201 (CA 2d Cir) (1950), affirmed 341 US 494, 95 L ed 1137, 71 S Ct 857 (1951). In fact, the Uniform Code explicitly gives the convening authority a large measure of discretion in selecting court members to the end that he obtain the "best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25 (d) (2),

Uniform Code of Military Justice, 10 USC § 825. As large as the discretion appears to be, the Uniform Code does not contemplate blanket exclusion of persons below specified rank as being unlikely to possess the statutory qualities.

Nothing in the Uniform Code expressly limits membership on a court-martial to persons of a particular rank. On the contrary, notwithstanding the reference to the selection of those "best qualified," Article 25 implies all ranks and grades are eligible for appointment. Subsection (d) (1) carries forward the venerable tradition that, whenever it can be avoided, no court member shall be junior in rank or grade to the accused. Since the provision allows a court member junior to the accused to serve (see Mullan v United States, 140 US 240, 35 L ed 489, 11 S Ct 788 (1891)), Congress, apparently, believed the lower ranks would contain qualified persons who would be appointed to courts-martial as occasions warranted. The practice, both before and after the Uniform Code, reflects this belief, at least as far as officer members are concerned. The many records of trial that have come before this Court show that lieutenants and captains in the Army are frequently appointed to courts-martial, although they probably have substantially less experience and years of service than colonels and generals. Similarly, Navy courts-martial often include lieutenants as members, but rarely have admirals. Much less variation in rank has been observed in the enlisted membership, but, even here, almost all ranks have been appointed.

Enlisted grades range from E–1, the lowest, to E–9, the highest. Statistics presented by appellate defense counsel show that in the Army, during the period between 1959 through 1963, no enlisted court member was lower in grade than an E–4. Considering that E–1s and E–2s are normally persons with short periods of service, and allowing further for the statutory preference for persons senior in rank to the accused, the appellant's statistics appear to reflect a realization that all enlisted ranks are eligible for selection as

court members. The testimony of several witnesses at the Congressional hearings on the Uniform Code indicates a general understanding to that effect. The following exchange between Mr. George Spiegelberg, testifying on behalf of the American Bar Association, and several members of the House Armed Services Subcommittee, is, perhaps, most representative:

"Mr. PHILBIN. Do you think a jury trial in any circumstances is advisable?

"Mr. SPIEGELBERG. No, sir. As I said before, Mr. Philbin, I do not think that you should permit civilian interference.

"Mr. PHILBIN. I am speaking of a jury trial of his own peers.

"Mr. SPIEGELBERG. Oh, you are talking about the enlisted men on the court.

"Mr. RIVERS. That is what I am talking about.

"Mr. SPIEGELBERG. I am sorry, perhaps I misunderstood you completely. Frankly, and this has been discussed at length in the American Bar Association, we do not think that you get very far by having enlisted men on courts.

"Mr. RIVERS. It is not going to hurt.

"Mr. SPIEGELBERG. No, absolutely no.

"Mr. RIVERS. I do not think so.

"Mr. SPIEGELBERG. If it gives the enlisted man a feeling of confidence—

"Mr. RIVERS. That is right.

"Mr. SPIEGELBERG. That he might be able to have some of his peers on the court—

"Mr. RIVERS. That is right.

"Mr. SPIEGELBERG. Certainly the experiment can do no harm. But my shrewd guess would be that most of the enlisted men who serve on courts will either be master sergeants or tech sergeants with from 6 years' service up and that they will be more severe in their judgment of the man on trial than would officers.

"But I agree completely. It does no harm and it may do good.

"Mr. RIVERS. That is right.

"Mr. GAVIN. Why would it necessarily have to be a sergeant or a master sergeant?

"Mr. SPIEGELBERG. It would not. But, I say, my guess is that you will find in most cases the enlisted men on the court will be either first or second grade.

"Mr. PHILBIN. Why should that follow, necessarily?

"Mr. SPIEGELBERG. Well, I do not know why except that those are the enlisted men that the commander or the junior officer—the company commanders—know and they are the men that they actually select and recommend as being qualified for court-martial duty.

"Mr. PHILBIN. Of course, in doing it, you could see that it would be a fair representation of all enlisted men, of all ranks, and so forth.

"Mr. SPIEGELBERG. You could. But I think it is not more than a third now on the court and that would mean at most two on the average court, and it would be pretty hard to administer such a provision.

"I do not say it could not be done. I think it is better not to try to specify—." [Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 715, 723, 724.]

Two other matters reflect the general understanding at the time of enactment of the Code that all enlisted persons are eligible for court membership. First, the Uniform Code's definition of an enlisted person is not limited to those above a specified rank. 10 USC § 101 (17), superseding original Article 1(9), 50 USC § 551, defines an enlisted person as "a person in an enlisted grade." (Emphasis supplied.) Secondly, the requirement of the 1948 Elston Act that court members have not less than two years' service was eliminated in the Uniform Code.

What we have said about the original

understanding of the Code's enlisted membership provision in- ██ dicates that a method of selection which disregards individual qualification and deliberately and systematically excludes all enlisted persons of the lower ranks is contrary to the Uniform Code. Cf. Thiel v Southern P. Co., 328 US 217, 90 L ed 1181, 66 S Ct 984 (1946). The question is whether such discriminatory exclusion was practiced in this case.

Appellate defense counsel contend the statistics presented to us show that so few members of the lower ██ enlisted ranks have served on courts-martial in relation to the large number of senior ranks as to establish a *prima facie* case of deliberate and long-continued discrimination throughout the Army. See Norris v Alabama, 294 US 587, 79 L ed 1074, 55 S Ct 579 (1935); Pierre v Louisiana, 306 US 354, 83 L ed 757, 59 S Ct 536 (1939). There are several flaws in the argument. For one, it is extremely doubtful that the accused's statistics can properly be applied to the court-martial jurisdiction in which he was tried. The figures for 1960, for example, show there were fifty-one general courts-martial with enlisted members; twenty-two of these tried accused in the rank of E-3 and E-4. One of the E-3 cases had an E-4 court member; apparently, four of the E-4 cases had E-5 court members. It would seem, therefore, that in almost twenty-three percent of the cases in these categories, the court membership included enlisted persons in the lowest rank that would assure compliance with the statutory preference for members senior to the accused. We are not informed as to the commands in which these courts were appointed. If they were appointed within the general court-martial jurisdiction in issue, there would patently be little substance to the accused's claim of arbitrary discrimination against the lower ranks of enlisted personnel. Also, there is evidence that this jurisdiction had no requests by enlisted accused, other than in this case, for enlisted court members since October 1962. There is no evidence of how many, if any, requests were made in previous periods. Consequently, there is little or no basis for an inference of arbitrary discrimination from the fact of non-appointment of lower ranks over a long period of time. Cf. Hill v Texas, 316 US 400, 86 L ed 1559, 62 S Ct 1159 (1942). Taken as a whole, and considered in the light most favorable to the accused, the statistics do not establish a policy or predilection to exclude lower ranks from consideration for court membership, without regard to the qualifications established by the Uniform Code.

Turning to the particular method of selection in this case, Government counsel contend the accused's evidence fails to show any impropriety by the convening authority. They argue that there is a vast and vital difference between the list of the prospective court members submitted by the staff judge advocate and the actual selections by the convening authority. They say that the convening authority's request for an enlisted man not on the list shows he *"did not regard [it] as binding."* If the convening authority ██ himself had no desire to discriminate arbitrarily against the lower ranks, discrimination by those charged with the responsibility for preparation of the list of eligibles would nevertheless vitiate the selection process. Glasser v United States, 315 US 60, 86 L ed 680, 62 S Ct 457 (1942); United States v Dennis, 183 F2d 201, supra, at pages 217-218. We must, therefore, consider appellate defense counsel's contention that the list of eligibles was invalid because those on the list were selected by the deliberate and blanket exclusion of all but senior noncommissioned officers. Such exclusion, they say, however well-intentioned it may have been, undermines the integrity of the courts-martial system. See Thiel v Southern P. Co., supra.

The evidence does not show what enlisted ranks were contemplated by the staff judge advocate as constituting senior noncommissioned officers. Appellate defense counsel impress upon us the fact that of four enlisted men on the court, the lowest grade appointed was an E-7. There were, however, eight to ten names on the list, and we

38

are not informed of the rank of the unselected eligibles. One or more of them may have had a lower rank than E–7. Still, we need not determine the precise rank separating the senior noncommissioned officer from other enlisted personnel. Whatever the cutoff point, undeniably some groups of otherwise eligible persons were not considered by the staff judge advocate in the initial selection. Was this so reprehensible as to invalidate his method?

Gross population figures are generally recognized as not being useful for the purpose of determining qualified veniremen. United States v Flynn, 106 F Supp 966, 972 (SD NY) (1952); United States v Shannabarger, 19 F Supp 975, 978 (WD Mo) (1937), ruling sustained in Walker v United States, 93 F2d 383 (CA 8th Cir) (1937). Some method of weeding out from the general population is essential. Every method involves a choice which will exclude part of the general community. In fact, normal statutory standards of eligibility such as age, literacy, and mental health automatically eliminate a part of the general population. Beyond the specific statutory exclusions, a method of selection which leaves out part of those nominally within the scope of eligibility is not necessarily unlawful. The use of voter registration lists as sources for eligibles has consistently been upheld, notwithstanding that qualified nonvoters are thereby automatically excluded. Gorin v United States, 313 F2d 641 (CA 1st Cir) (1963), cert den 374 US 829, 10 L ed 2d 1052, 83 S Ct 1870 (1963); United States v Flynn, supra. Similarly, telephone directories are valid selection sources, although they exclude those who may be qualified for jury service, but are too poor, or are unwilling, to have telephones. United States v Van Allen, 208 F Supp 331 (SD NY) (1962). The gloss history has written on the *Magna Carta* provision that no "Freeman shall be taken . . . but by lawful Judgment of his Peers" does not demand that the triers of the facts come exclusively from the identical group to which the accused belongs. Without attempting to analyze separately the

multitude of cases on the subject, it would appear that the important question is whether the standard for selection is relevant to the statutory bases for eligibility as a juror. An irrelevant reason cannot be used to exclude a substantial group of otherwise qualified persons because it deprives the jury system "of the broad base it was designed . . . to have in our democratic society." Ballard v United States, 329 US 187, 195, 91 L ed 181, 67 S Ct 261 (1946). The rule was exemplified in the *Thiel* case, supra, which struck down a system of selection that excluded all who earned their livelihood on a daily basis. The Supreme Court noted that "the pay period of a particular individual is completely irrelevant to his eligibility and capacity to serve as a juror." Thiel v Southern P. Co., 328 US 217, supra, at page 223. See also United States v Henderson, 298 F2d 522, 525 (CA 7th Cir) (1962), cert den 369 US 878, 8 L ed 2d 280, 82 S Ct 1150 (1962), in which the Court of Appeals for the Seventh Circuit described the rule as prohibiting exclusion of a substantial group on the basis of "irrational or self-imposed standards."

A method of selection which uses criteria reasonably and rationally calculated to obtain jurors meeting the statutory requirements for service is proper. Such a system does not threaten the representative nature of the panel. Over a defense objection, for example, that the selection system unfairly excluded members of the lower economic brackets, a United States District Court sustained the blanket exclusion of loafers and hangers-on, on the ground it was reasonably apparent such persons lacked the statutory requirements that jurors be sober, intelligent, and of good reputation. United States v Shannabarger, supra, at pages 977–978. In United States v Flynn, 106 F Supp 966, supra, at pages 978–979, the defendants contended the method of selection discriminated against manual workers. There, a prospective juror was excluded if the qualification questionnaire sent to him by the clerk's office was returned incomplete or with misspellings. The court held that these

deficiencies in the questionnaire bore directly on the statutory requirements that jurors be able to read and write, and that they be intelligent and well-informed.

We may take judicial notice that many enlisted persons below the senior noncommissioned ranks ▮▮▮▮▮ are literate, mature in ▮▮▮▮▮ years, and sufficiently judicious in temperament to be eligible to serve on courts-martial. It is equally apparent, however, that the lower enlisted ranks will not yield potential court members of sufficient age and experience to meet the statutory qualifications for selection, without substantial preliminary screening. It is permissible to anticipate, therefore, as did the staff judge advocate in this case, that the senior ranks will more readily provide a large number of persons possessing the varied qualities enumerated in the Uniform Code. In fact, the discussions of Article 25 in the hearings on the Code, which we quoted partially earlier, show a general understanding that the relationship between the prescribed qualifications for court membership, especially "training, experience, and length of service," and seniority of rank is so close that the probabilities are that those in the more senior ranks would most often be called upon to serve. House Hearings, supra, at page 724; see also Hearings before Senate Armed Services Committee on S. 857 and H. R. 4080, 81st Congress, 1st Session, page 183. In the civilian community, a preference for certain voting districts as potentially more fruitful sources of eligible jurors is not exclusionary discrimination. United States v Dennis, supra. Reliance upon a standard of selection which is directly and reasonably calculated to obtain persons with the qualifications prescribed by law does not vitiate the selection system. All enlisted persons may be eligible ▮▮▮▮▮ for membership on courts-martial; but not all enlisted ranks must, or for that matter can, be represented on any one court-martial. The Uniform Code requires a choice based upon a variety of qualities, not, as the staff judge advocate

pointed out, "willy-nilly" recourse to the routine duty roster.

Appellate defense counsel argue that senior noncommissioned officers are to be distinguished from all other enlisted persons in that they have a predilection to convict. No evidence is presented or offered to support that contention. And we reject summarily, as obnoxious to the Uniform Code and the traditions of American justice, the assumption that a senior noncommissioned officer would violate his oath to decide the cause impartially, because he is afraid of, or desires to curry favor with, the officer-members of the court. Our experience, and our convictions, are to the contrary.

Career enlisted persons are no more inclined or likely to prejudge an accused, or to treat him with greater severity, than are career officers. This is not to say that all persons, commissioned and noncommissioned, are always free from fixed ideas and attitudes which may predispose them unfavorably toward an accused. Some individuals may be biased, actually or apparently, and are, therefore, subject to challenge. United States v Drain, 4 USCMA 646, 16 CMR 220; see also United States v Hedges, 11 USCMA 642, 29 CMR 458. Disqualification of an individual, however, does not vitiate ▮▮▮▮▮ the process by which the ▮▮▮▮▮ court members were selected. Here, the only purpose in looking to the senior noncommissioned ranks was to obtain persons possessed of proper qualifications to judge and sentence an accused. There was no desire or intention to exclude any group or class on irrelevant, irrational, or prohibited grounds. In short, the evidence leaves no room to doubt that the selection process was designed only to find enlisted men qualified for court service. The senior noncommissioned ranks provided a convenient and logically probable source for eligibles. To refer first to those ranks for prospective members is not an impermissible choice. United States v Dennis, supra.

We turn to the intentional selection of a Negro to serve as a court member,

Complaints about color or race in the selection of jurors normally deal with the *exclusion* of qualified persons solely on such irrelevant and prohibited bases. See Annotation, "Violation of constitutional rights of defendant in criminal case by unfair practices in selection of grand or petit jury," 82 L ed 1053. However, in Collins v Walker, 329 F2d 100 (1964), the Court of Appeals for the Fifth Circuit granted a writ of *habeas corpus* on the ground the accused, a Negro, was unlawfully discriminated against when the panel of twenty grand jurors which indicted him was so organized as deliberately to *include* six Negroes. The court reasoned that the intentional inclusion of Negroes constituted "discrimination against . . . [the accused] because of his race or color." *Id.*, at page 105. With due respect to the learning and experience of the Court of Appeals, we think it misapprehended the fundamental difference between inclusion of a member of a particular group for the purpose of obtaining a fair representation of a substantial part of the community, and exclusion of members of that group so as to reduce the representational character of the jury. In Avery v Georgia, 345 US 559, 562, 97 L ed 1244, 73 S Ct 891 (1953), which was relied upon by the Court of Appeals, the Supreme Court criticized the practice of using a white ticket to designate a prospective white juror, and a yellow ticket to indicate a Negro juror. However, the criticism was related to the established fact that no Negroes had been selected for service over an extended period of time, although they numbered five percent of the jury list. The flagging of the tickets, together with the long continued failure to select a single Negro for service, was held to establish a *prima facie* case of *exclusion* of Negroes from jury duty. It was exclusion, not inclusion, that vitiated the selection process. In Dow v Carnegie-Illinois Steel Corporation, 224 F2d 414 (CA 3d Cir) (1955), cert den 350 US 971, 100 L ed 842, 76 S Ct 442 (1956), the clerk deliberately tried to place more than one Negro juror on each panel. To achieve that purpose, the cards of eligible jurors were marked to show those who were Negro.

The court pointed out that, unlike *Avery*, which was a case of exclusion, the inclusion of Negroes on the jury was designed "to insure a fair representation" of that class, and was, therefore, proper. Dow v Carnegie-Illinois Steel Corporation, 224 F2d 414, supra, at pages 425–426. Accord: United States v Dennis, 183 F2d 201, supra, at page 223; United States v Forest, 118 F Supp 504 (ED Mo) (1954). If deliberately to include qualified persons ▇▇▇▇▇▇ ▇▇ is discrimination, it is discrimination in favor of, not against, an accused. Equal protection of the laws is not denied, but assured. We hold, therefore, there was no error in the deliberate selection of a Negro to serve on the accused's court-martial.

The decision of the board of review is affirmed.

KILDAY, Judge (concurring in the result):

I concur in the result reached by Chief Judge Quinn. I do not agree with all of the reasons given by him in reaching that result. Because the routes we follow are so divergent, I feel it is requisite that my views be separately stated.

The Congress has power "to make Rules for the Government and Regulation of the land and naval Forces," Constitution of the United States, Article I, Section 8, Clause 14. This power is entirely separate from the Congressional judicial powers as outlined in Article III of the Constitution. This is made clear in the early case of Dynes v Hoover, 20 Howard 65 (U. S. 1858), in the following language:

"These provisions show that Congress has the power to provide for the trial and punishment of military and naval offenses in the manner then and now practiced by civilized nations; and that the power to do so is given without any connection between it and the 3d article of the Constitution defining the judicial power of the United States; indeed that the two powers are entirely independent of each other."

An accused before a court-martial is not entitled to a jury trial. Ex parte

Milligan, 4 Wall 2, 123 (U. S. 1866); Ex parte Quirin, 317 US 1, 87 L ed 3, 63 S Ct 2 (1942); United States v Culp, 14 USCMA 199, 33 CMR 411.

A court-martial must be convened in faithful compliance with the statute under which it is authorized as is made clear by the following language of the Supreme Court:

". . . A court-martial is the creature of statute, and, as a body or tribunal, it must be convened and constituted in entire conformity with the provisions of the statute, or else it is without jurisdiction." [Mc-Claughry v Deming, 186 US 49, 62, 46 L ed 1049, 22 S Ct 786 (1902).]

". . . To give effect to its [the court-martial] sentences, it must appear affirmatively and unequivocally that the court was legally constituted; that it had jurisdiction; that all the statutory regulations governing its proceedings had been complied with, and that its sentence was conformable to law." [Runkle v United States, 122 US 543, 556, 30 L ed 1167, 7 S Ct 1141 (1887).]

It would therefore appear that it is neither necessary nor desirable to cite and analyze cases governing the formation of a jury in a trial before a court created and proceeding under the judicial power conferred by Article III of the Constitution in evaluating the formation of a court-martial under a statute passed by the Congress in the exercise of the power to make rules for the government and regulation of the land and naval forces conferred by Article I as the "two powers are entirely independent of each other." Dynes v Hoover, supra. Our inquiry in the case at bar should be limited to consideration as to whether, in the formation of the court-martial, the convening authority complied with the provisions of the statute.

Article 25 (c) (1), Uniform Code of Military Justice, 10 USC § 825, makes it abundantly clear that any (or all) enlisted persons are eligible to serve on general and special courts-martial, where enlisted members are requested by the accused and within the other limitations expressly provided in Article 25, supra. The selection of enlisted men is, by Article 25 (d) (2), committed to the sound discretion of the convening authority. There is, however, the strong direction of Article 25 (d) (1) that, "When it can be avoided, no member of an armed force may be tried by a court-martial any member of which is junior to him in rank or grade."

In this separate opinion it shall be my purpose, by consideration of the statutory provisions, the legislative history of the provision for enlisted members of courts-martial, and other considerations, to point out that the convening authority acted in conformity with such statutory provisions; and that the appellant was tried by a fair and impartial court-martial.

The issue pending before us for decision is contained in the language of the granted assignment as follows:

"THE INTENTIONAL AND SYSTEMATIC EXCLUSION FROM AN ENLISTED COURT-LIST OF MEMBERS OF LOWER ENLISTED GRADES, OTHERWISE ELIGIBLE, IS UNLAWFUL, AND IN THIS CASE, SUCH EXCLUSION DEPRIVED THE ACCUSED OF MILITARY DUE PROCESS."

It is to be noted that the appellant does not contend the court-martial which tried him was biased or prosecution minded. He does not contend the members appointed were not qualified, nor is there any indication the appellant did not receive a fair trial. Rather, he alleges that "Senior noncommissioned officers, quite naturally, would view a disturbance in a barracks in a different light than would lower grade enlisted men, and it is strenuously submitted that such senior noncommissioned officers would be likely to consider the entire matter more as a breakdown in discipline than anything else."[1] There is,

---

[1] The charges and specifications and record of trial reflect that rather than this being a simple disturbance in the barracks, the accused was convicted of three specifications of assault with a deadly weapon (one specification by kicking the victim in the head with his foot encased in a shoe and two by brandishing an open straight edged razor) during a fight in the barracks.

however, no contention that those who served on this court-martial were so oriented. Therefore, the naked question presented concerns the consideration for appointment and the appointment, as members of the court-martial, of senior noncommissioned officers only.

Appellate Government counsel vigorously contend that inasmuch as this question was first raised by an "Article 38(c) Brief" which was never presented to the convening authority; there was an absence of objection at the time the court-martial was convened as to the manner in which it was selected; the appellant failed to exercise any challenge for cause or peremptorily challenge any officer-member; and since he did not in any manner raise an issue relative to the composition or the manner of its selection; appellant is now precluded from raising the objection for the first time on appeal.

I am not prepared to say all of these objections are without merit. Indeed, orderly procedure obviously dictates that any complaint regarding the composition of a court-martial should be raised at the earliest opportunity, where prompt action may be taken to rectify any defect. On the other hand, the importance of the issue involved, the earnestness with which it is presented, the fact that there are additional cases containing the identical question pending disposition by us, and other considerations, in my opinion, render it highly desirable, if not essential, that we proceed now to its determination.

I

In military jurisprudence, courts-martial were composed of officers only from time immemorial. At the conclusion of World War I and, again, at the conclusion of World War II, there was bitter complaint, from those who had served, against the manner in which military justice had been administered, including the exclusion from courts-martial of all enlisted personnel. These complaints gave rise to the consideration of these questions by a number of committees, commissions and boards, both officially appointed and privately convened.

The proposal that enlisted men be eligible to so serve was recommended, officially, to the House of Representatives, during the 79th Congress, through a report of a subcommittee of the Committee on Military Affairs, which was investigating the national war effort, the report being authored by Honorable Carl Durham, a Representative from North Carolina (House Report No. 2722, 79th Congress, 2d Session, page 2 (1946)).

During the 80th Congress, on March 12, 1947, Honorable Robert P. Patterson, Secretary of War, forwarded to the Speaker of the House of Representatives a draft of a bill entitled:

"A bill to amend the Articles of War to improve the administration of military justice, to provide for more effective appellate review, to insure the equalization of sentences and for other purposes."

This draft bill was offered in the House of Representatives and became H. R. 2575, 80th Congress, 1st Session. It is to be noted that this bill constituted proposed amendments to the existing Articles of War, governing the Army. Included therein was a proposed amendment to "Art 4. Who May Serve on Courts-Martial," the second subsection thereof reading as follows:

"All enlisted persons in the active military service of the United States or in the active military service of the Marine Corps when detached for service with the Army by order of the President, shall be competent to serve on general and special courts-martial for the trial of enlisted persons and persons of these categories shall be detailed for such service *when deemed proper by the appointing authority.*" [Emphasis supplied.] [Hearings before House Armed Services Committee on H. R. 2575, 80th Congress, 1st Session, page 1904.]

It is to be noted that H. R. 2575 was referred to the Legal Subcommittee of the Committee on Armed Services, of which Honorable Charles Elston, a Representative from Ohio, was Chairman, and upon the adoption of the bill

it became popularly known as the "Elston Act."

At that time the Under Secretary of War represented the Secretary of War in the administration of military justice. Honorable Kenneth C. Royall, Under Secretary of War, appeared before the Elston Subcommittee to interpret and give the Department's views with reference to the pending bill. In explaining the provision for enlisted men as members of courts-martial, Secretary Royall stated:

*"The bill would make qualified senior enlisted personnel*—here is another point that has caused a great deal of criticism, and I am going to discuss that a little more fully later on—from other units than that of the enlisted man tried eligible to serve as members of general and special courts martial which try enlisted men, this to be done within the discretion of the appointing authority.

. . . . . .

"As to enlisted men on the courts . . . the bill follows the recommendation of the American Bar Association Committee. The belief has been expressed in some quarters that enlisted men should be required on all courts trying enlisted men and that the matter should not be left discretionary with the appointing authority. On the other hand, there is a definite feeling that enlisted men may not wish to be tried by other enlisted men. And some combat commanders feel that it would be detrimental to discipline to have enlisted men on courts. For these reasons, I think, the committee left the matter flexible—at least those are our reasons for approving the committee's recommendation.

. . . . . .

"The second thing is they found that the enlisted men who were in authority—the sergeants and the corporals—were in many instances inclined to be considerably harsher than the officers, which from my experience in World War I was certainly the case. I don't know whether they have changed since then or not."

[Emphasis supplied.] [House Hearings, supra, pages 1920–1923.]

Brigadier General Hubert D. Hoover, Assistant Judge Advocate General in charge of military justice matters of the Army, testified, in part, as follows:

"As we conceive it, the appointment of enlisted persons is designed not to expand the groups of persons who may be eligible to serve on courts martial in order that we shall have an additional reservoir of eligibles, but, if we may put it that way, the appointment is authorized in deference to what appears to be the public demand for participation by enlisted persons in courts martial.

. . . . . .

"Another consideration which comes to me is that the ordinary enlisted man who is selected for court-martial duty will probably be one of noncommissioned grade, because of his capacity and his experience. I think that the enlisted man who is being tried is due for a pretty serious disappointment, when he gets his sentence, because I really think that the noncommissioned officers will be harder with respect to punishment than officers will be." [House Hearings, supra, pages 2019, 2022.]

In reporting H. R. 2575, with amendments, to the House of Representatives and recommending that the bill, as amended, be passed, the committee stated the manner in which it had amended the War Department's proposal as to the language of Article 4 of the Articles of War with a very significant observation as follows:

"Should enlisted men be authorized to sit as members of a court martial in the trial of other enlisted men?

"The War Department agrees that they should, at the option of the appointing authority. Our committee agrees that they should, at the option of the defendant and has amended section 3 accordingly. *We seriously doubt that the inclusion of enlisted men as members of the court will benefit enlisted men who are defendants, however, the choice is properly a right of the defendant. Once hav-*

44

*ing exercised that right he must assume the responsibility for the results of his choice."* [Emphasis supplied.] [House Report No. 1034, 80th Congress, 1st Session, page 6.]

The provision, as thus amended, passed both the House of Representatives and the Senate and became law. The Elston Act also contained, as a part of Article of War 4, substantially the same language as presently appears in Article 25 (d) (2) of the Code as to considerations to be observed by the appointing authority in convening a court-martial, except that it also contained the provision, "officers and enlisted persons having less than two years' service shall not, if it can be avoided without manifest injury to the service, be appointed as members of courts-martial in excess of minority membership thereof."

It is manifest that the committee and the Congress granted, in Article of War 4, wide discretion to the appointing authority in choosing those to compose the court-martial. It is equally manifest that had the Congress intended that such Article be construed as now contended by appellant, it had full authority, by appropriate language, to so provide. Rather, with a frank caveat from the highest civilian official and the highest military official of the War Department, having responsibility for the administration of military justice, that the language used would result in the appointment of noncommissioned officers or qualified senior enlisted personnel, nevertheless the Congress adhered to the language used by such officials in their draft bill. That the committee agreed such personnel would be appointed, and that they could be expected to be harsher than commissioned personnel is rendered indisputable by the language of the committee report expressing serious doubt that such enlisted men on courts-martial would benefit the defendant, and its even stronger caveat that: "Once having exercised that right he must assume the responsibility for the results of his choice."

## II

With this background and legislative history of the introduction of enlisted men as members of courts-martial, I proceed to a consideration of the circumstances surrounding the enactment of Article 25, Uniform Code of Military Justice, 10 USC § 825.

The Elston Act was approved by the President on June 24, 1948, 62 Stat 604, 627, Public Law 759, 80th Congress. On February 8, 1949, Honorable James Forrestal, Secretary of Defense, forwarded to the Speaker of the House of Representatives a draft of a proposed bill "To unify, consolidate, revise, and codify the Articles of War, the Articles of the Government of the Navy, and the disciplinary laws of the Coast Guard, and to enact and establish a Uniform Code of Military Justice."

Article 25 of this draft bill followed the provisions of Article of War 4 of the Elston Act, but contained sufficient difference in language to justify the quotation of the whole thereof herein:

"ART. 25. Who may serve on courts-martial.

"(a) Any officer on active duty with the armed forces shall be competent to serve on all courts-martial for the trial of any person who may lawfully be brought before such courts for trial.

"(b) Any warrant officer on active duty with the armed forces shall be competent to serve on general and special courts-martial for the trial of any person, other than an officer, who may lawfully be brought before such courts for trial.

"(c) Any enlisted person on active duty with the armed forces who is not a member of the same unit as the accused shall be competent to serve on general and special courts-martial for the trial of any enlisted person who may lawfully be brought before such courts for trial, but he shall be appointed as a member of a court only if, prior to the convening of such court, the accused has requested in writing that enlisted persons serve on it. After such a request, no enlisted person shall be tried by a general or special court-martial the membership of which

**45**

does not include enlisted persons in a number comprising at least one-third of the total membership of the court, unless competent enlisted persons cannot be obtained on account of physical conditions or military exigencies. Where such persons cannot be obtained, the court may be convened and the trial held without them, but the convening authority shall make a detailed written statement, to be appended to the record, stating why they could not be obtained.

"For the purposes of this article, the word 'unit' shall mean any regularly organized body as defined by the Secretary of the Department, but in no case shall it be a body larger than a company, a squadron, or a ship's crew, or than a body corresponding to one of them.

"(d) (1) When it can be avoided, no person in the armed forces shall be tried by a court-martial any member of which is junior to him in rank or grade.

"(2) When convening a court-martial, the convening authority shall appoint as members thereof such persons as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament. No person shall be eligible to sit as a member of a general or special court-martial when he is the accuser or a witness for the prosecution or has acted as investigating officer or as counsel in the same case." [Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 572.]

It should be noted that the above Article 25 (d) (1) is a provision which had existed in the Articles of War for many years. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 71. The language of Article 25 (d) (2) was orginally enacted by Act approved June 4, 1920, 41 Stat 759.

The proposal for the adoption of a Uniform Code of Military Justice was referred, by the Committee on Armed Services, to a subcommittee of which Honorable Overton Brooks, a Representative from Louisiana, was Chairman, and that subcommittee held extended and exhaustive hearings on its proposals.

The question of the eligibility and selection of enlisted men as members of courts-martial was again discussed by this second subcommittee to study the question. At that time a total of fifteen courts-martial containing enlisted men had been held and full information with reference thereto was available to the subcommittee. Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 727.

Among others, George A. Spiegelberg, Esquire, Chairman of the Special Committee on Military Justice of the American Bar Association, addressed himself to this question, testifying, in part, as follows:

"Mr. SPIEGELBERG. Oh, you are talking about the enlisted men on the court.

"Mr. RIVERS. That is what I am talking about.

"Mr. SPIEGELBERG. I am sorry, perhaps I misunderstood you completely. Frankly, and this has been discussed at length in the American Bar Association, we do not think that you get very far by having enlisted men on courts.

"Mr. RIVERS. It is not going to hurt.

"Mr. SPIEGELBERG. No, absolutely no.

"Mr. RIVERS. I do not think so.

"Mr. SPIEGELBERG. If it gives the enlisted man a feeling of confidence—

"Mr. RIVERS. That is right.

"Mr. SPIEGELBERG. That he might be able to have some of his peers on the court—

"Mr. RIVERS. That is right.

"Mr. SPIEGELBERG. Certainly the experiment can do no harm. But my shrewd guess would be that most of the enlisted men who serve on courts will either be master sergeants

or tech sergeants with from 6 years' service up and that they will be more severe in their judgment of the man on trial than would officers.

"But I agree completely. It does no harm and it may do good.

"Mr. RIVERS. That is right.

"Mr. GAVIN. Why would it necessarily have to be a sergeant or a master sergeant?

"Mr. SPIEGELBERG. It would not. But, I say, my guess is that you will find in most cases the enlisted men on the court will be either first or second grade.

"Mr. PHILBIN. Why should that follow, necessarily?

"Mr. SPIEGELBERG. Well, I do not know why except that those are the enlisted men that the commander or the junior officer—the company commanders—know and they are the men that they actually select and recommend as being qualified for court-martial duty.

"Mr. PHILBIN. Of course, in doing it, you could see that it would be a fair representation of all enlisted men, of all ranks, and so forth.

"Mr. SPIEGELBERG. You could. But I think it is not more than a third now on the court and that would mean at most two on the average court, and it would be pretty hard to administer such a provision.

"I do not say it could not be done. I think it is better not to try to specify—." [ *Ibid*, pages 715, 724.]

After having heard testimony as to the manner in which the amended Article of War 4, making enlisted men eligible for membership on courts-martial, had been construed and administered, the Congress saw fit to re-enact the same in substantially the same language. That no oversight was involved is evident. The fact that the Congress saw fit to change some of the language of Article of War 4 in re-adopting it as Article 25, places it beyond cavil that Congress recognized and ratified the prior interpretation made by the War Department, the executive department charged with respon-

sibility for its interpretation. United States v Davis, 12 USCMA 576, 31 CMR 162; United States v Littrice, 3 USCMA 487, 13 CMR 43; United States v Scheunemann, 14 USCMA 479, 482, 34 CMR 259.

### III

Turning now to the language of Article 25(d)(1) and 25(d)(2), it is observed that the same is neither doubtful, obscure nor ambiguous, and resort to rules of statutory construction is unnecessary. United States v Davis, supra. The first clear and positive direction to the convening authority in appointing a court-martial is that: "When it can be avoided, no person in the armed forces shall be tried by a court-martial any member of which is junior to him in rank or grade." This is an ancient provision of military law. Winthrop, supra. The plain and unambiguous meaning of this provision is that an accused before a court-martial is to be tried by his superiors, not by his peers or equals as is the case of a civilian defendant before a jury.

The direction of Article 25(d)(2) is that the convening authority shall appoint as members thereof such persons as, *in his opinion*, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament. It would be difficult to conceive of words with which more adequately to commit the selection to the sound discretion of the convening authority. If the person under consideration for appointment is not junior to the accused, the selection is of those who *"in his opinion"* are best qualified. The guidelines established are those which, among other worthwhile qualifications, tend to the accumulation of rank or grade. We are not blind to, nor ignorant of, the fact that under statutory provisions and ancient military procedures, age, education, training, experience, and length of service, do produce an accumulation of military rank and grade. This determination is within the sound discretion of the convening authority. He may not abuse that discretion by the choice of individuals who are not fair and impartial. He can no more "stack" the

court against the interests of the accused than he can pollute the court by command control or influence against him. United States v Hedges, 11 USCMA 642, 29 CMR 458; United States v Kitchens, 12 USCMA 589, 31 CMR 175. In the case before us there is no contention nor intimation that the convening authority abused his discretion in the selection of the individuals who composed the court, nor that any of them were other than fair and impartial.

## IV

In an able and exhaustive brief, appellate defense counsel point out that in a long series of cases, which they cite, the Supreme Court has established certain general rules which are now followed by the Supreme Court and other Federal courts as well. Counsel conclude that, broadly stated, the major rules are as follows: (1) An accused is not entitled to any particular kind of jury; (2) an accused has no right of inclusion on the panel of any person or class of persons; but (3) an accused is entitled to a fair and impartial jury drawn from a panel from which no class of eligible persons was systematically, arbitrarily, and purposefully excluded because of membership in that class or prejudice against that class.

Most likely counsel has analyzed the Federal cases correctly and has come to a justifiable conclusion with reference to those cases. However, the fact remains that in a military trial, an accused is entitled to no jury, but to a court-martial chosen in accordance with Article 25, Uniform Code of Military Justice, supra, the system of military justice provided by Congress in the exercise of its constitutional power to make rules for the government and regulation of the land and naval forces. Ex parte Milligan, 4 Wall 2, 137–138 (U.S. 1866); Ex parte Quirin, 317 US 1, 87 L ed 3, 63 S Ct 2 (1942); United States v Culp, 14 USCMA 199, 33 CMR 411. The language used in DeWar v Hunter, 170 F2d 993 (CA10th Cir) (1948), cert den 377 US 908, 93 L ed 1720, 69 S Ct 1048 (1949), well and properly states the law:

"Appellant's contention that a court-martial constituted to try a private soldier, composed entirely of officers, violates the 6th Amendment of the Constitution, in that it denies him a right to a trial before his peers or equals, is not well founded. The right of trial by jury guaranteed by the 6th Amendment to the Constitution of the United States is not applicable in a trial by military court-martial. Hence, decisions respecting the right to trial by one's peers in civil courts are inapplicable. A soldier is subject to military law and what constitutes due process in a trial by a military tribunal is gauged by the principles of military law enacted by the Congress, provided the accused is given due notice of the charge against him, a fair opportunity to prepare his defense, and his guilt is adjudicated by a competent tribunal."

The conclusion of the Court of Appeals for the Tenth Circuit is confirmed by those decisions of the Supreme Court holding unconstitutional provisions of the Uniform Code of Military Justice subjecting certain categories of civilians to trial by court-martial. The burden of those cases is that Congress may make liable to trial by court-martial only persons in military status and subject to military law, for the reason that civilians are not subject to those exceptions to constitutional protections and due process which apply to those in military status. Toth v Quarles, 350 US 11, 100 L ed 8, 76 S Ct 1 (1955); Reid v Covert, 354 US 1, 1 L ed 2d 1148, 77 S Ct 1222 (1957); Kinsella v United States, 361 US 234, 4 L ed 2d 268, 80 S Ct 297 (1960); McElroy v Guagliardo, 361 US 281, 4 L ed 2d 282, 80 S Ct 305 (1960); Grisham v Hagan, 361 US 278, 4 L ed 2d 279, 80 S Ct 310 (1960). Thus the cases cited by the defense and which control in the selection of juries in civilian courts have but limited application to an accused before a court-martial, and none toward this accused.

Attention has been given to the fact that the issue as granted refers to the "intentional and systematic exclusion from an enlisted court-list of members of lower enlisted grades." Article 25, Uniform Code of Military Justice,

supra, does not provide for any lists of prospective court members, in the sense that panels of prospective jurors must be formulated or persons drawn therefrom by lot or otherwise. Rather, that Article places the responsibility and grants the discretion to the convening authority to appoint the court members from no list or from any list. This record indicates that one of the enlisted men contemplated for the court was chosen by the convening authority on his own responsibility. Attention has also been given to the fact that this is the only case upon which enlisted men had served upon a court-martial in the area in which this trial was had over a protracted period and no evidence as to whether during any other time enlisted men had been requested in any other case. It is doubtful that this one case could show anything to be systematic.

In view of the fact that Article 25, Uniform Code of Military Justice, supra, places the selection of the officer and enlisted members of a court-martial within the sound discretion of the convening authority and there being no evidence or contention of abuse of that discretion in the choice of the individuals who served on the court-martial, no error is reflected by this assignment.

Proceeding to the consideration of the efforts made by the convening authority to secure a Negro enlisted man as a member of the court-martial, I concur with the Chief Judge in his conclusion and the reasoning by which he reached the same. Here, again, there is no contention the enlisted man selected and appointed by the convening authority was biased, prosecution minded nor in anywise other than a fair and impartial member of the court. One of the officer-members was also of appellant's race, a Negro, and no complaint is made as to his membership on the court. This record reveals no more than that, in the exercise of his discretion, the convening authority chose this court member as qualified for membership on the court. As the Chief Judge points out, this contention is without merit.

I agree, the decision of the board of review should be affirmed.

FERGUSON, Judge (dissenting):

I dissent.

This case presents issues of the gravest concern to the administration of military justice and basically poses the questions whether the right to have enlisted personnel serve on courts-martial is to be enforced as Congress intended or is to be rendered valueless by Army practice, and whether race—a standard so strongly rejected by our Federal constitutional system—is to be allowed to raise its ugly banner as a criterion for membership on our military tribunals. There is no room for disagreement here; there is but a single answer which we can return to these inquiries. Whether by enactment of Congress or constitutional principle, no convening authority may limit selection of enlisted court members to senior noncommissioned officers, nor may he—regardless of motive—deliberately introduce into the military judicial system the practice of selecting a Negro to serve on a court-martial because of the color of the defendant's skin. Mr. Justice Harlan's ringing prophecy in Plessy v Ferguson, 163 US 537, 41 L ed 256, 16 S Ct 1138 (1896), is the law which we should this day follow:

". . . But in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved." [Plessy v Ferguson, supra, at page 559.]

I regret that my brothers have reached a different conclusion—not because of the consequences to Private Crawford, for the clemency extended him below renders our affirmance of little practical import to him—but because of the incalculable damage done to our system of military justice. To paraphrase Abraham Lincoln, the world

will little remark what we have done here; it will not soon forget what we have said. While I have not succeeded in persuading them to follow the only path which I, in good conscience, can adopt, I necessarily record my reasons in order to disassociate myself from conclusions which are difficult to sustain either in logic or in law.

On June 4, 1963, various charges of aggravated assault against the accused were referred to trial by general court-martial. On June 10, 1963, the accused submitted a written request that enlisted personnel be appointed by the convening authority to the general court-martial designated to hear his case. Affidavits filed by various officers involved in the process of selecting members indicate the following occurred.

According to the sworn declarations of the staff judge advocate, upon receiving the accused's request, the "adjutant general or his deputy was requested to furnish my office *a list of senior noncommissioned officers* who were regarded as responsible and available for court-martial duty." (Emphasis supplied.) Further, in view of the fact that Private Crawford was a Negro, "we asked that at least one enlisted man be colored." These names were submitted, a written list was prepared, and the matter turned over to the chief of staff. Prospective colored members were marked with an asterisk, and "I . . . indicated in some way, possibly a double asterisk, the court members who I believed were possibly better qualified by intelligence or temperament for the responsible assignment of being general court members."

In delivering the list to the chief of staff, the staff judge advocate "explained . . . that while I thought it desirable that at least one of the enlisted members be colored in view of the fact that Crawford was accused of a knife assault on a white soldier, one of the officer members was colored, and that a colored enlisted member was therefore not too important. . . . In short, I furnished a list of names and asked the Commanding General to select therefrom or to ask for other names,

keeping in mind that at such short notice we might not be able to obtain a colored enlisted member."

The chief of staff delivered the list to the convening authority, returned and informed the staff judge advocate "the Commanding General wanted one colored member (whose name as I recall was Sergeant Rufus Jones) appointed to the court. This colored enlisted man's name was not on the list submitted by me to the General." In addition, the convening authority had marked the names of those senior noncommissioned officers on the list whom he desired to serve as the balance of the enlisted membership.

When Sergeant Jones was contacted, he vehemently protested that he was white, and the staff judge advocate obtained the name of another available colored, senior noncommissioned officer. This individual was appointed by the convening authority to serve at the trial.

The staff judge advocate pointed out that, in "seeking names of prospective court members I have always sought individuals with integrity and common sense." He thought "seniority of rank might give some indication of civic responsibility and intelligence and that amongst this group of nominees the Commanding General, hopefully, might find some nuggets of pure gold for court-martial membership purposes."

The deputy staff judge advocate submitted an affidavit generally corroborative of that of the staff judge advocate, adding that he had sought, on the latter's behalf, from the adjutant general, a list of "nine or ten . . . mature, responsible and experienced *senior noncommissioner officers* from units other than the accused." (Emphasis supplied.) He had specifically requested "the name of a colored noncommissioned officer be included if this was possible." The need for nine or ten names was required in order to give the Commanding General a broader basis for selecting the needed four enlisted members.

From January 1961, until accused's trial in June 1963, no other defendant had requested enlisted personnel to be appointed to his court-martial.

Other affidavits filed on behalf of the accused support the foregoing declarations and establish beyond cavil that the standard for appointment of enlisted personnel to Crawford's court was that of "mature, responsible and experienced *senior noncommissioned officers*" (emphasis supplied) with the direction that a Negro noncommissioned officer be included.

Those enlisted personnel who were actually appointed to hear accused's case and, in fact, did so, were Sergeant Major (E–9) Graeff, Sergeant Major (E–9) Giggey, Sergeant Major (E–9) Frejosky, and Master Sergeant (E–7) McNair, the last named being the Negro member located and recommended for selection to the Commanding General by the staff judge advocate. Thus, three out of the four members who participated in the trial occupied the highest enlisted grade in the Army and the fourth, while two steps below them, was also in the class popularly referred to as "first three graders."

In addition to the foregoing matters, the defense submitted to this Court certain statistical charts reflecting Army practice in appointing enlisted court members during the period 1959–1962. These in general indicate that, in 5,582 trials, enlisted accused sought appointment of enlisted court members on only 154 occasions. In 1959, out of 221 enlisted members thus selected, 204, or 92.3%, held the three most senior grades in the Army—E–7, E–8, or E–9. Yet, only three cases involved accused of the rank of E–7, and no E–8 or E–9 personnel were subjected to trial.

In 1960, 206 enlisted members were appointed to hear 51 cases. There were 186 such persons in the three senior grades, amounting to 90% of those selected. Again, only three cases were tried involving defendants in the grade of E–7, and no first sergeants or sergeant majors were brought to trial.

In 1961, 179 enlisted members participated in 46 cases. One hundred and sixty were "first three graders," constituting 89.3% of those selected. During this year, only one defendant ranked as high as an E–7.

In 1962, the last year covered by the statistical analysis, 35 trials involved appointment of 136 enlisted members. One hundred eighteen, or 86.7%, were in the grades of E–7, E–8, or E–9, although only two defendants were so ranked. Thus, for the whole period of 1959–1962, an average of 89.4% of all enlisted court members have been selected from the three most senior noncommissioned officer grades.

The foregoing constitute the factors which bear upon the decision which this Court is required to make concerning whether, in the words of the assignment:

> "THE INTENTIONAL AND SYSTEMATIC EXCLUSION FROM AN ENLISTED COURT-LIST OF MEMBERS OF LOWER ENLISTED GRADES, OTHERWISE ELIGIBLE, IS UNLAWFUL, AND IN THIS CASE, SUCH EXCLUSION DEPRIVED THE ACCUSED OF MILITARY DUE PROCESS."

## II

At the outset, two matters which tend to obfuscate the issue before us should be clarified and put to one side. First, the Government stringently urges that the affidavits provided by the appellate defense counsel are not properly before us and that the entire matter was waived at the trial level by failure to enter any objection to the composition of the court-martial or to use the provided challenging process. The principal opinion mentions the matter in passing but eliminates it from consideration on the basis that Crawford's dilemma should be resolved in order to settle the question and eliminate uncertainty. In my opinion, the issue strikes at the heart of the process by which court members are selected, involves a violation of the Congressional mandate concerning the appointment of enlisted personnel, and is, therefore, jurisdictional in nature.

In McClaughry v Deming, 186 US 49, 46 L ed 1049, 22 S Ct 786 (1902), the Supreme Court declared, at page 62:

> ". . . A court-martial is the creature of statute, and, as a body or tribunal, *it must be convened and constituted in entire conformity with the provisions of the statute, or else*

**51**

*it is without jurisdiction."* [Emphasis supplied.]

And in Runkle v United States, 122 US 543, 30 L ed 1167, 7 S Ct 1141 (1887), the same body declared, at page 555:

"A court-martial organized under the laws of the United States is a court of special and limited jurisdiction. It is called into existence for a special purpose and to perform a particular duty. When the object of its creation has been accomplished it is dissolved. . . . To give effect to its sentences it must appear affirmatively and unequivocally that the court was legally constituted; that it had jurisdiction; that all the statutory regulations governing its proceedings had been complied with, and that its sentence was conformable to law."

These decisions, which stand unimpeached today, make it clear that exacting compliance with the commands of the Code regarding the constitution of courts-martial is required in order to breath judicial life into the proceedings. United States v Robinson, 13 USCMA 674, 33 CMR 206; United States v Vanderpool, 4 USCMA 561, 16 CMR 135. Whether there has been such compliance is the very question before us. And that jurisdictional matters may be raised and disposition made of them on the basis of affidavits is clearly settled both in this Court and before the boards of review. United States v Ferguson, 5 USCMA 68, 17 CMR 68; United States v Roberts, 7 USCMA 322, 22 CMR 112; United States v Dickenson, 6 USCMA 438, 20 CMR 154; Rule IX F Uniform Rules of Procedure for Proceedings In and Before Boards of Review. The cases upon which the United States relies to support the contrary conclusion deal with the ordinary incidents of the trial and matters in mitigation of punishment. See United States v Fagnan, 12 USCMA 192, 30 CMR 192, and United States v Roberts, supra. Jurisdictional questions may be raised at any time, and the argument of waiver has no place in this controversy.

Secondly, the issue whether a member of the armed forces is entitled to a trial by jury is not involved here. That has long since been settled by the Supreme Court, and it cannot be gainsaid that neither indictment by grand jury nor trial by petit jury is constitutionally required in the military forces. Ex parte Quirin, 317 US 1, 87 L ed 3, 63 S Ct 2 (1942); United States v Culp, 14 USCMA 199, 33 CMR 411; United States v Jacoby, 11 USCMA 428, 29 CMR 244. It is for the Congress to provide the rules for the government of the land and naval forces, subject, generally, to the necessity for providing an opportunity for a fair hearing. Whelchel v McDonald, 340 US 122, 95 L ed 141, 71 S Ct 146 (1950). I hasten to add that the Congressional power is circumscribed, as the Chief Judge notes, by those constitutional guarantees which are neither expressly nor impliedly made inapplicable to military trials. United States v Jacoby, supra. And the "military courts, like the state courts, have the same responsibilities as do the federal courts to protect a person from a violation of his constitutional rights." Burns v Wilson, 346 US 137, 142, 97 L ed 1508, 1515, 73 S Ct 1045, 1048 (1953). But the issue of trial by jury of one's peers, except insofar as Congress has provided therefor in the Uniform Code, is not one with which we are now concerned. Rather, it is a question of what Congress has determined with regard to enlisted composition of courts-martial that needs must be found.

### III

Code, supra, Article 25, 10 USC § 825, provides pertinently:

"(c)(1) *Any enlisted member of an armed force on active duty who is not a member of the same unit as the accused is eligible to serve on general and special courts-martial for the trial of any enlisted member of an armed force who may lawfully be brought before such courts for trial, but he shall serve as a member of a court only if, before the convening of the court, the accused personally has requested in writing that enlisted members serve on it. After such a request, the accused may not be tried by a general or special court-martial*

the membership of which does not include enlisted members in a number comprising at least one-third of the total membership of the court, unless eligible enlisted members cannot be obtained on account of physical conditions or military exigencies. If such members cannot be obtained, the court may be convened and the trial held without them, but the convening authority shall make a detailed written statement, to be appended to the record, stating why they could not be obtained.

. . . . .

"(d) (1) *When it can be avoided, no member of an armed force may be tried by a court-martial any member of which is junior to him in rank or grade.*

"(2) When convening a court-martial, the convening authority shall detail as members thereof *such members of the armed forces* as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." [Emphasis supplied.]

As long ago as United States v Dickenson, supra, we pointed out, at page 449:

"A statute must be interpreted in accordance with the declared intention of the legislature. United States v Cooper Corp., 312 US 600, 61 S Ct 742, 85 L ed 1071; Hassett v Welch, 303 US 303, 58 S Ct 559, 82 L ed 858. If the words used in the statute convey a clear and definite meaning, a court has no right to look for or to impose a different meaning. It is clearly and forcefully set out in 50 Am Jur, Statutes, § 225, page 207, that 'a plain and unambiguous statute is to be applied, and *not interpreted,* since such a statute speaks for itself, and any attempt to make it clearer is a vain labor and tends only to obscurity.' "

See also United States v Hicks, 6 USCMA 621, 20 CMR 337, and United States v Davis, 12 USCMA 576, 31 CMR 162.

That is the principle which is applicable to our consideration of Code, supra, Article 25. We do not sit here, as did the Committee on Armed Services, to determine what rules should govern the convening authority in selecting court members. We take the rules which the Committee saw fit to submit to the House and Senate after long and careful consideration; which those bodies saw fit to pass and submit to the President; and which that Chief Executive, acting pursuant to his constitutional authority, determined to approve. To act otherwise is simply to substitute our judgment for that of those to whom the legislative authority is properly confided and to set military justice upon a course rejected by the representatives of the people. And when we view it properly, the statute inescapably makes every enlisted member of the armed forces, who is not a member of the same unit as the accused, eligible for appointment on courts-martial.

First, Code, supra, Article 25, expressly declares, "Any enlisted member of an armed force on active duty who if not a member of the same unit as the accused is eligible to serve . . . for the trial of any enlisted member of an armed force." This declaration can scarcely be found to contain any ambiguities or to require construction which would merely serve to introduce doubts not theretofore present. United States v Hicks, supra. Secondly, having made this general declaration of eligibility, the Article in question goes on to state certain specific substandards for use in selecting court members from this class of *all* enlisted men. It continues in effect and codifies the long policy of appointing no members to the court junior to the accused in rank or grade if such can be avoided. Code, supra, Article 25 (d) (1). It confers upon the convening authority the sole discretion to select from the class first delineated in the enactment those who are, "in his opinion . . . best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." The only other condition contained in the statute, which is not relevant to the problem before us, is the prohibition

**53**

against appointing any person as a court member who was the accuser, a witness for the prosecution, or who had acted as investigating officer or counsel in the same case. Code, supra, Article 25(d)(2).

The statute, therefore, sets up a class of enlisted members who, after accused has filed his request for their appointment in writing, are all eligible for consideration by the convening authority. Not a single condition is inserted with regard to their rank or position within the military community, except those very general and personal factors which are to be considered by the convening authority in the exercise of his discretion. Indeed, the authors of the Uniform Code expressly eliminated in Code, supra, Article 25, the proviso contained in its predecessor legislation, which prohibited members with less than two years' service from being appointed to hear general and special court-martial cases. See Public Law 759, 80th Congress, 62 Stat 604, 628. And the reasons which led to the creation of this broad class of eligibles were those placed before the House Armed Services Committee as the views of enlisted men in general:

". . . They have two particular reasons for wanting it.

"One is that they feel that officers, in the main, have never served in the enlisted grades and do not understand the problems of enlisted people. While they don't expect any particular sympathy from the court because of that, a court which might include enlisted persons, nevertheless they feel that they would have more understanding.

"The second reason is this: They say it is much more democratic. They just like the idea that they have a choice. They say 'We would have it in civilian life and we like the idea that we can have it here.'" [Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 1142.]

Throughout the Hearings, fears were expressed that an attempt would be made to limit the accused's right by appointing only senior noncommissioned officers to courts-martial. Committee counsel brought to the members' attention the fact that "some of these 'crusty' noncoms might throw the book at these boys." House Hearings, supra, page 1140. And, as the Chief Judge notes, Mr. Spiegelberg, appearing on behalf of the American Bar Association, thought the right would prove valueless to enlisted accused as "most of the enlisted men who serve on courts will either be master sergeants or tech sergeants with from 6 years' service up and . . . they will be more severe in their judgment of the man on trial than would officers." House Hearings, supra, page 724. The comments of Mr. Philbin, a member of the House Committee, indicate perplexity as to "[w]hy should that follow, necessarily" and why the convening authority could not get "a fair representation of all enlisted men." House Hearings, supra, page 724. Perhaps Senator Wayne Morse most succinctly stated the legislative position when he declared:

"Why can we not have findings of fact by a cross-section of your personnel, whether the man is an enlisted man or a general?

"We have bankers and ditchdiggers on our juries, and I do not know why we cannot have generals and privates on our court-martial when a determination of facts in the application of the law—[is in question]." [Hearings before Senate Armed Services Committee on S. 857 and H. R. 4080, 81st Congress, 1st Session, page 93.]

All these considerations make clear beyond cavil the Congressional intent that all enlisted personnel be eligible for consideration by the convening authority in selecting enlisted members for courts-martial, and, as noted above, the express, unambiguous words of the statute command it. Yet, turning to the evidence before us, we find that each and every affidavit presented declares that the convening authority limited his choice of members to the very class which Congress hoped would not become the sole source of eligibles, i. e., "senior noncommissioned officers." Thus, the staff judge advocate listed as recommended court members only those

"senior noncommissioned officers who were regarded as responsible and available for court-martial duty." The affidavit which he filed indicates he considered seniority of rank the governing "indication of civic responsibility and intelligence." His deputy deposed that the list submitted to the convening authority was limited to "nine or ten . . . mature, responsible and experienced senior noncommissioned officers." And those senior noncommissioned officers considered most qualified for appointment were duly marked with double asterisks by the staff judge advocate. Finally, from this list and after an apparently extended hunt for another senior noncommissioned officer of the colored race, the enlisted members actually appointed consisted of three sergeants-major (E–9) and one master sergeant (E–7). Truly, this was precisely the sort of court which Mr. Spiegelberg, in testifying before the Armed Services Committee, feared would, in practice, result, and the sort of members to which the Committee Counsel referred as "some of these 'crusty' noncoms." House Hearings, supra, page 1140. Upon the face, therefore, of the record before us, the very letter of Code, supra, Article 25, was violated, for—contrary to its terms—the convening authority looked only to a small group of senior noncommissioned officers in selecting enlisted court members rather than making a choice from "such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." To hold to the contrary simply writes into the statute, as a matter of law, that those who possess high enlisted rank, not only meet all these qualifications but are the only ones who do so. And this conclusion is reached despite the existence in the Army of a large reservoir of highly educated and trained enlisted specialists who hold comparable pay grades but are not considered noncommissioned officers as their tasks envision the use of technical skill rather than command.

That such practice is not limited to the jurisdiction with which we now deal is graphically illustrated by the statistics furnished on this appeal by counsel regarding the appointment in general of senior grade enlisted personnel to courts-martial. The average of 89.4% throughout the Army eloquently bespeaks the reason why the right to have enlisted personnel on one's court-martial has become a relatively dead letter throughout the armed services.

It is in considering the effect of such deliberate exclusion of other ranks and junior noncommissioned officers from consideration for court membership that well considered precedents in the Federal system become relevant. Thus, the Supreme Court has consistently struck down systematic, arbitrary, and discriminatory exclusion of classes from jury service, when it appears that such classes meet the qualifications for service under the statutes involved. Of particular interest to those who argue that private soldiers—the "hoi polloi"— are not qualified to judge their fellows is the following language dealing with a similar contention regarding Negroes:

". . . The general attitude of the jury commissioner is shown by the following extract from his testimony: 'I do not know of any negro in Morgan County over twenty-one and under sixty-five who is generally reputed to be honest and intelligent and who is esteemed in the community for his integrity, good character and sound judgment, who is not an habitual drunkard, who isn't afflicted with a permanent disease or physical weakness which would render him unfit to discharge the duties of a juror, and who can read English, and who has never been convicted of a crime involving moral turpitude.' In the light of the testimony given by the defendant's witnesses, we find it impossible to accept such a sweeping characterization of the lack of qualifications of negroes in Morgan County. It is so sweeping, and so contrary to the evidence as to the many qualified negroes, that it destroys the intended effect of the commissioner's testimony." [Norris v Alabama, 294 US 587, 598, 79 L ed 1074, 1081, 55 S Ct 579, 587 (1935).]

And, in speaking of the deliberate exclusion of daily wage earners from a Federal jury, and, finding no base for such action under applicable statutes, Mr. Justice Murphy stated, for the Supreme Court:

". . . Wage earners, including those who are paid by the day, constitute a very substantial portion of the community, a portion that cannot be intentionally and systematically excluded in whole or in part without doing violence to the democratic nature of the jury system. Were we to sanction an exclusion of this nature we would encourage whatever desires those responsible for the selection of jury panels may have to discriminate against persons of low economic and social status. We would breathe life into any latent tendencies to establish the jury as the instrument of the economically and socially privileged. That we refuse to do.

". . . Thus a blanket exclusion of all daily wage earners, however well-intentioned and however justified by prior actions of trial judges, must be counted among those tendencies which undermine and weaken the institution of jury trial. 'That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may, one by one, lead to the irretrievable impairment of substantial liberties.' Glasser v United States, supra (315 US 86, 86 L ed 707, 62 S Ct 457).

". . . The evil lies in the admitted wholesale exclusion of a large class of wage earners in disregard of the high standards of jury selection. To reassert those standards, to guard against the subtle undermining of the jury system, requires a new trial by a jury drawn from a panel properly and fairly chosen." [Thiel v Southern P. Co., 328 US 217, 90 L ed 1181, 66 S Ct 984, at page 223 (1946).]

So also in this case, as has been demonstrated above, there is no basis in law for the exclusion of those persons who are not senior noncommissioned officers and who certainly form "a very substantial portion of the [military] community." Thiel v Southern P. Co., supra. Both the admitted practice in this case and statistics regarding such appointments to courts-martial throughout the Army should indicate to us our duty to revivify the Article in question, to prevent the very practice which its proponents in Congress feared, and, as did the Supreme Court in the case of Federal juries, deny the breath of life to those who would make the court-martial the instrument of the higher ranks and eliminate the thoughts of those who sought to infuse in it some of the spirit of a civilian jury trial. House Hearings, supra, at page 1142. I would conclude, therefore, that this accused's court-martial consisted in part of improperly chosen enlisted members, was not duly constituted, and would order another trial.

IV

It does not appear that the Chief Judge disagrees with the legal conclusion which I reach, for he, too, finds nothing in the "Uniform Code expressly limits membership on a court-martial to persons of a particular rank" and that Code, supra, Article 25, "implies all ranks and grades are eligible for appointment." He finds, nevertheless, that the evidence does not establish the practice of discriminatory exclusion in this case. First, he treats each general court-martial jurisdiction within the Army as if it were a separate entity unresponsible for appointments occurring in other commands and, thus, believes the statistics filed by appellate defense counsel are of little moment. But, assuming such an approach to be correct, the value of the statistics lies in the background which it furnishes for consideration of the action of the convening authority and staff judge advocate in this case. It demonstrates beyond peradventure a widespread refusal on the part of the military to consider other than first three grade noncommissioned officers for appointment on courts-martial and serves to illuminate the affidavits filed in this

case concerning selection from a list expressly limited to senior noncommissioned officers. In short, as was stated in Hernandez v Texas, 347 US 475, 98 L ed 866, 74 S Ct 667 (1954), at page 479:

> "The petitioner's initial burden in substantiating his charge of group discrimination was to prove that persons of Mexican descent constitute a separate class in Jackson County, distinct from 'whites.' One method by which this may be demonstrated is by showing the attitude of the community."

So also may the attitude of the military community toward the elimination of lower enlisted grades in the process of selecting and appointing enlisted court members be shown.

Secondly, conceding that the convening authority was limited to *"senior noncommissioned officers"* during the selection process, the Chief Judge believes that such a limitation is valid on the basis "that the senior ranks will more readily provide a large number of persons possessing the varied qualities enumerated in the Uniform Code." In so concluding, he relies on a number of well-settled Federal decisions which permit various criteria and sources to be used in the selection of veniremen. United States v Flynn, 106 F Supp 966, 972 (SD NY) (1952); Walker v United States, 93 F2d 383 (CA 8th Cir) (1937); Gorin v United States, 313 F2d 641 (CA 1st Cir) (1963), cert den 374 US 829, 10 L ed 2d 1052, 83 S Ct 1870 (1963). But the important point which he overlooks is that none of these cases, in setting up various means of obtaining qualified jurors, involved a departure from statutory norms or a narrowing of those eligible under the statute by class. Cf. Thiel v Southern P. Co., supra. Thus, in *Gorin,* supra, Chief Judge Woodbury, speaking for the Circuit Court, stated, at page 644:

> "This does not mean blanket endorsement of jury selection directly or indirectly from voting lists. It means that voting lists may be used as the basis for jury selection *unless it appears that in the community there is systematic and intentional exclusion from those lists of a particular economic, social, religious, racial, geographical, or political group. When such a showing is made some other basis of selection must be used.* Here, however, the appellants have not shown that in Boston any enumerated class is systematically and intentionally discriminated against in registering to vote. Indeed the evidence is quite to the contrary." [Emphasis supplied.]

In the instant case, however, the affidavits make quite clear that the convening authority was limited to the class or group of senior noncommissioned officers, thereby excluding from consideration all those not possessing one of those ranks. The statistics cited show that in the Army there is a "systematic and intentional exclusion" from such court lists of the other ranks. *Gorin,* supra, at page 644. Hence, rather than the use of the ordinary screening process, we are confronted with the intentional narrowing of the class of eligibles under the Article in question which, in respect to a similar process under Federal jury enactments, the Supreme Court so vigorously condemned in Thiel v Southern P. Co., supra. In short, we have that very departure from the statute which its drafters feared and predicted would occur. Taken all in all, the Chief Judge's reasoning to the contrary notwithstanding, if such can be done through the device of screening potential members, then the wording of the Article making "[a]ny enlisted member" eligible to participate in the military judicial process is indeed meaningless.

For these reasons, I record my disagreement with his conclusion.

## V

The final question before us deals simply with whether a convening authority may ever select a member of a court-martial of the same race as the accused solely on the grounds of that race, *i.e.,* legitimately appoint a Negro member of a court solely on the grounds that the defendant is colored. In my opinion, he clearly cannot.

The authorities are, of course, legion

**57**

that systematic exclusion of Negroes or other classes of persons from service on juries is constitutionally impermissible. Norris v Alabama, supra; Hernandez v Texas, supra; Eubanks v Louisiana, 356 US 584, 2 L ed 2d 991, 78 S Ct 970 (1958); Arnold v North Carolina, 376 US 773, 12 L ed 2d 77, 84 S Ct 1032 (1964). But it is equally discriminatory deliberately to *include* court members on the basis that they are of the same race as the defendant.

In Collins v Walker, 329 F2d 100 (CA 5th Cir) (1964), it was established that six Negroes were intentionally included in a list of twenty persons from whom twelve grand jurors were to be drawn. Five were actually selected to serve on the grand jury which indicted the accused, whose case was the only one scheduled to be heard by such body. The Circuit Court of Appeals concluded that the indictment was void and granted a writ of *habeas corpus* to the defendant. In so acting, it stated, at page 105:

"The only list of importance to the decision of this case is the list of twenty from which the foreman was selected and the other eleven grand jurors drawn. Six Negroes were deliberately included in this list of twenty because of their race. When to this circumstance is added the additional facts then known to the jury commissioners that the grand jury to be chosen from that list of twenty was to consider whether to return an indictment against Collins, and that no other case was scheduled to be considered by that grand jury, the conclusion becomes inescapable that in the organization of the grand jury which indicted Collins there was discrimination against him because of his race or color."

While, because of the nature of our national development, most cases have involved *exclusion* of Negroes from juries, the whole point of the discussion in this area is that race is an impermissible criterion for selection of jurors. In the administration of justice, we are to all be considered, not as Negroes, Whites, Chinese, Jews, or Christians, but as Americans. That is

the teaching of Collins v Walker, supra, and, contrary to the view of my brothers, I believe it is well-founded. Mr. Justice Harlan's dictum that the Constitution is color-blind is worth repeating. Plessy v Ferguson, supra. An accused cannot demand that members of his own race be appointed to his court-martial, but he is "entitled to demand under the Constitution . . . that in organizing the . . . jury there shall be no discrimination against him because of his race or color." Collins v Walker, supra, at page 105; Martin v Texas, 200 US 316, 50 L ed 497, 26 S Ct 338 (1906).

In Avery v Georgia, 345 US 559, 562, 97 L ed 1244, 73 S Ct 891 (1953), the Supreme Court condemned the use of white and yellow tickets to indicate the race of prospective jurors, holding that such constituted *prima facie* evidence of discrimination. Mr. Justice Frankfurter, concurring, noted that "opportunity for working of a discriminatory system exists whenever the mechanism for jury selection has a component part, . . . that differentiates between white and colored." *Id.*, supra, at page 564. How much more does that discrimination exist when, as here, the convening authority is furnished with a list, the Negro members of which are marked with an asterisk! To establish conclusively the use of such an impermissible standard, it appears that, rejecting the colored member suggested by the staff judge advocate, the general determined to appoint another sergeant who turned out to be white. Finally, the staff judge advocate himself sought out Master Sergeant McNair and secured his appointment on the court-martial solely on the basis of his race and that of the defendant. Thus, in defiance of the constitutional prohibitions, as laid down in Collins v Walker and Avery v Georgia, both supra, race was undeniably used as the standard by which at least one of the court members was selected and, for this reason also, I would reverse the decision of the board of review and order a new trial.

## VI

In sum, then, I am of the opinion

that this record conclusively establishes the convening authority impermissibly limited himself to senior noncommissioned officers in choosing enlisted court members, in violation of Code, supra, Article 25. Further, the detailed and arduous quest for a Negro member of the court, selected solely on the basis of his race, establishes beyond cavil that the ugly fact of race was considered, at least in this jurisdiction, to be the standard by which military jurors should be selected in the case of Negro defendants. I would not hesitate to strike this practice down and remind commanders everywhere that neither race, nor color, nor creed, enter into the administration of any American judicial system. Considering as I do that these errors go to the competency of the court-martial which heard accused's case, I would order another trial before a properly selected court. Thiel v Southern P. Co., supra.

I, therefore, dissent from the contrary view of my brothers.